# In The Matter Of:

*Burelle v.*
*Quebecor World Pawtucket*

---

*Ernest Joseph John Masse, Jr.*
*October 28, 2005*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File 102805MH.TXT, 158 Pages*
*Min-U-Script® File ID: 1763800583*

**Word Index included with this Min-U-Script®**

MR. DIORIO: Stipulate to that.
A: Fine.
Q: In what position were you employed by Packaging Graphics?
A: At what time?
Q: Well, starting in 1997 what was your position?
A: Sales.
Q: And did that position change at some point?
A: Yes.
Q: And how did it change?
A: I became Sales Manager.
Q: And when did you become Sales Manager?
A: 1998.
Q: And how long did you remain the Sales Manager?
A: Until I left.
Q: And that was in 2002?
A: I believe it was January of 2002.
Q: Now, what were your responsibilities as Sales Manager?
A: I was responsible for the company's sales and growth.
Q: And what did you do to fulfill those responsibilities?
A: I helped the sales department to target individual accounts, to go on meetings with them, to set



goals.
Q: Is it fair to say that part of your responsibility as Sales Manager was to manage the sales force?
A: Correct.
Q: And is it fair to say, Mr. Masse, that Bill Burelle was one of the sales representatives for whom you had responsibility?
A: Correct.
Q: Now, what were Mr. Burelle's responsibilities as a sales representative?
A: To meet targeted goals and to represent Packaging Graphics.
Q: Now, you said that you were a Sales Manager. Were there other sales managers at Packaging Graphics?
A: At what time?
Q: Let's say in the spring of 2002.
A: Yes.
MR. DIORIO: I object. He's already testified he left there in January of 2002.
A: I'm not sure I have the dates correct when I was there, I'd have to look at my records, and I'm not quite sure of the dates. I think it was '97 to —.
MS. HORNE: We'll mark this as 1.



(AMENDED COMPLAINT IN RE:MASSE VS. QUEBECOR WORLD PACKAGING GRAPHICS, INC., ET ALS, WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 1 FOR IDENTIFICATION.)

Q: Mr. Masse, I'm handing you a document that the court reporter has marked as Plaintiff's Exhibit 1. Can you identify that document?
MR. DIORIO: Objection. Go ahead.
Q: You can answer.
A: Yes, Amended Complaint.
Q: And is it fair to say, Mr. Masse, that this was an Amended Complaint that was filed on your behalf against Quebecor World Packaging Graphics, Inc. and other defendants?
MR. DIORIO: Objection.
Q: You can answer, but you have to answer verbally.
A: I'm just reading it.
Q: Okay.
A: Yes.
Q: And turning to paragraph 7 of the Amended Complaint, does that paragraph refresh your recollection as to the date of your termination of employment from Quebecor?
MR. DIORIO: Just note my continuing objection to questions regarding Plaintiff's Exhibit 1.



A: Yes.
Q: And are you able to tell us now on what date you ceased employment with Quebecor World?
A: January 7, 2003.
Q: So, Mr. Masse, going back to the spring of 2002, you would agree with me that you were employed by Packaging Graphics during the spring of 2002?
A: Correct.
Q: Now, during the spring of 2002 how many sales managers were there at Packaging Graphics?
A: Two.
Q: And who were those sales managers?
A: Myself and Greg Iannuccillo.
Q: To whom did you report as Sales Manager?
A: Gary Stiffler.
Q: And what was Mr. Stiffler's position?
A: Vice-President of Operations.
Q: Did Mr. Stiffler have an office in the same building as you?
A: Yes.
Q: And that office was at the Packaging Graphics facility in Pawtucket?
A: Correct.
Q: Now, including Mr. Burelle how many sales representatives did you have responsibility for

record made of your discussions with them?
A: No.
Q: Were discussions conducted with Mr. Burelle about Herman and John Souzas's concerns at that time?
A: Yes.
Q: Who was involved in those discussions?
A: Myself and Mr. Burelle.
Q: Were Herman or John Souza involved in those discussions?
A: No.
Q: Did Mr. Burelle's sales performance continue to improve after the six-month period?
A: Yes.
Q: And when was the next time any issue arose as to Mr. Burelle's sales performance?
A: Three to six months before his termination.
Q: So if Mr. Burelle was terminated in June of 2002, your testimony would be that sometime in March, January to March of 2002 issues next arose with regard to Mr. Burelle's sales performance?
A: Actually it would be just about quarterly from the time we started in '98 until his termination. Quarterly we would have meetings discussing his performance.
Q: So your testimony is that you and Mr. Burelle



would have quarterly meetings to discuss his sales performance?
A: Correct.
Q: Did you have quarterly meetings with all your sales representatives?
A: Yes.
Q: Was there any written record kept of the discussions held in these quarterly meetings?
A: There were some records kept, yes.
Q: And where were those written records maintained?
A: My office.
Q: And what kind of records were they?
A: They were notes that I would make and discussions that I would have with Mr. Burelle in regards to his performance.
Q: Is it fair to say that you maintained those notes in a file that you kept, as opposed to them being placed in Mr. Burelle's personnel file?
A: I believe there were one or two that were placed in his personnel file. Most of them were kept by me.
Q: When you left Quebecor did you leave those notes at Quebecor?
A: Yes.
Q: Mr. Masse, are you able to tell me as to the



quarterly meetings that you had with Mr. Burelle from 1999 or so through let's say the end of 2001, was it your perception that Mr. Burelle's performance was generally satisfactory?
A: No.
Q: In what way was it not satisfactory?
A: I kept forewarning Mr. Burelle that he was putting all his eggs in one basket with one or two accounts and that his account list was never growing and that at some point during a time that he would lose one of these accounts through attrition, he would be left with nothing. So I kept after Mr. Burelle to seek new business, increase his account list, and if you look at the records through the years that he was there, his account list never went over five or six accounts.
Q: Is it your testimony that this was the case throughout this period from 1999 through 2001?
A: Yes.
Q: Now, you testified that you met quarterly with all of your sales representatives.
A: Correct.
Q: Okay. And is it fair to say, Mr. Masse, that as the Sales Manager it was your responsibility to help the sales department achieve sales growth?



A: Yes.
Q: So is it fair to say, Mr. Masse, that in your meetings with all sales representatives you generally encouraged your sales representatives to expand their customer list?
A: Yes.
Q: Now, you testified earlier that —
(Interruption in proceedings.)
Q: — the next time the potential for Mr. Burelle's termination was discussed was approximately three to six months before he was actually terminated. Is that correct?
A: Yes.
Q: And in what context did that issue arise?
A: In a meeting that I had with Mr. Burelle.
Q: And do you remember when that meeting was?
A: There were many meetings, but it was one meeting in particular I remember having with him where I brought up the subject that unless things got better with his sales, that we would have to do something. I don't recall saying terminating him, but I do recall saying that there would have to be a change of some kind.
Q: And what did you contemplate that change would be?
A: To terminate him, on my part. I was charged with

Page 33

increasing the company's sales and he was not helping. Can I have a juice?
MR. ALTIERI: Sure. They're all the same.
MS. HORNE: This might be a good time for us to take a little break.
(Short break taken.)
(Testimony appearing on Page 32, Lines 7 through 25 and continuing on Page 33, Lines 1 through 2, was repeated by the stenographer.)
Q: Mr. Masse, you've had your juice now; is that correct?
A: Correct.
Q: Good. Now, you said that you were charged with increasing company sales and Mr. Burelle wasn't helping that process. Is that correct?
A: Correct.
Q: And in what way was he not helping that process?
A: By getting new accounts — by not getting new accounts.
Q: And did you, at that meeting, advise Mr. Burelle that he would need to meet some standards with regard to the acquisition of new accounts in order not to be terminated?
A: Yes.
Q: And what was the goal that you set for him in

Page 34

order to avoid termination?
A: That he would report to me every week on what new accounts he was calling on.
Q: And was that the only goal that was set for Mr. Burelle with regard to avoiding termination?
A: No. I believe we put like a 15 percent increase on his existing sales.
Q: What do you mean by existing sales?
A: People he was presently doing business with, if he was doing X number of dollars a year he had to increase it by 15 percent or more.
Q: And that was existing customers?
A: Doesn't matter how you increase it, if it was existing or new.
Q: So you advised him that he would need to show a 15 percent increase in his overall sales?
A: Yes.
Q: Regardless of whether they came from existing customers or new customers?
A: Correct.
Q: Is it fair to say that there was no particular goal set in terms of the number of new customers he had to achieve?
A: No, no goals were set for new customers.
Q: He just had to report to you each week as to what

Page 35

new potential accounts he had called on?
A: Correct.
Q: And did he do that? Did he report to you each week?
A: For a while.
Q: For how long?
A: A month or two.
Q: Was there anyone else present during this meeting with Mr. Burelle?
A: No.
Q: And can you recall at all, even in terms of what time of year it was, when this meeting occurred?
A: Started in 2002 probably in the fall or somewhere, about a year before we terminated him. It was an ongoing process with Mr. Burelle at all times.
Q: Were there any, was there any written record made of your discussions with Mr. Burelle?
A: Just my own notes.
Q: And do you know where those notes were kept?
A: My office.
Q: Now, you testified that Mr. Burelle complied with your request that he report to you each week regarding his calls on new accounts for a month or two. Is that correct?
A: Yes.

Page 36

Q: What did you mean by that? I mean, was there a time when it just sort of tailed off or did he just stop altogether?
A: It tailed off and I approached him and he told me that he was too busy with his existing accounts to call on any new people.
Q: And do you know when this was that you had this conversation?
A: No, I don't remember exactly when.
Q: Did you have any discussions with Mr. Burelle about why it was he considered himself too busy with existing accounts to deal with new ones?
A: Yes.
Q: And what was that discussion?
A: He had one account at the time that was, in his words, extremely demanding and he had to spend a lot of time taking care of it.
Q: And what account was that?
A: Vinyl Pak.
Q: And did Mr. Burelle tell you why it was that that one account was especially demanding?
A: Yes.
Q: And did you agree with his assessment?
A: No.
Q: Why not?

Page 137

Q: And when is it that you separated from employment of Quebecor?
MR. DiORIO: Asked and answered.
A: January 7th or something 2003.
Q: And you resigned from Quebecor; is that correct?
A: That's correct.
Q: Is it fair to say, Mr. Masse, that your resignation was requested?
A: No, not at all.
Q: How was it that you came to resign from Quebecor?
MR. DiORIO: Objection.
A: I could no longer work at Quebecor World for personal reasons.
Q: What were those personal reasons?
A: They were personal.
MR. DiORIO: I didn't hear that.
THE WITNESS: They were personal.
Q: Are you currently employed?
A: Yes.
Q: By whom?
A: Mason Box.
Q: In what capacity?
A: Sales Manager.
Q: And on what date did you become employed by Mason Box?

Page 138

A: July 15th, 2004.
Q: Now, after you left Quebecor you filed a claim with the Rhode Island Commission for Human Rights; is that correct?
A: Yes.
MR. DiORIO: Objection.
Q: You claimed in that claim that you were terminated from your employment on the basis of age discrimination. Is that correct?
MR. DiORIO: Objection.
A: No.
Q: In what way is it incorrect?
A: I was not terminated. I resigned.
Q: Did you assert in your filing with the R.I. Commission for Human Rights that you were discriminated on the basis of your age?
MR. DiORIO: Objection.
A: Yes.
Q: And why is it that you claim you were discriminated on the basis of your age?
MR. DiORIO: Objection.
A: Because of the way I was treated because of my age.
Q: And what treatment did you receive at Quebecor that you contend constituted age discrimination?

Page 139

MR. DiORIO: Objection.
A: I was demoted several times and also a younger gentleman took over some of my duties.
Q: Now, you subsequently filed a complaint in the Rhode Island Superior Court; is that correct?
A: Uh'huh (affirmative).
MR. DiORIO: Objection.
A: Yes.
Q: And the defendants in that action are Quebecor World Printing USA Corp. —
A: Correct.
Q: — and Fran Canzano —
A: Correct.
MR. DiORIO: Objection.
Q: — and Gary Stiffler?
MR. DiORIO: Objection.
A: Correct.
Q: When did Mr. Canzano become president of Quebecor?
A: I don't recall.
Q: Mr. Masse, turning to the Amended Complaint which you have in front of you, I believe, as Exhibit 1, in paragraph 18 of the complaint on page 3 you allege that, "On or about September 1st, 2002 the defendants demoted the plaintiff to the position of Senior Sales Associate." Is that correct?

Page 140

MR. DiORIO: Objection.
A: Correct.
Q: What was the reason given for your demotion?
MR. DiORIO: Objection.
A: That I was, I was being given a senior sales associate's position, otherwise, it was out the door.
Q: And were you advised why it was you were being given a Senior Sales Associate position?
MR. DiORIO: Objection.
A: They were not satisfied with the sales results, I guess.
Q: That was the reason given to you as to why you were demoted?
MR. DiORIO: Objection.
A: Yes.
Q: And do you believe that is the real reason that you were demoted?
MR. DiORIO: Objection.
A: No.
Q: What was the real reason?
MR. DiORIO: Objection.
A: That I didn't, I didn't fit into the management at the time.
Q: And what do you mean by that?

MR. DIORIO: Objection.
A: That I was not part of the, the team, is what they said.
Q: And what do you think they meant by that?
MR. DIORIO: Objection. State of mind and relevance.
A: That I was being pushed out of the position because they had someone else in mind for it.
Q: And that person they had in mind was a younger person?
MR. DIORIO: Objection.
A: Correct.
Q: Now, turning to paragraph 14 of the Amended Complaint, it states that, "During the late summer of 2002 the defendants began a systematic process of either terminating older sales representatives, encouraging their resignation, their early retirement, or increased productivity and sales quotas and demands for the older employees." Did I read that correctly?
MR. DIORIO: Objection.
A: Yes, you did.
Q: What evidence do you have that this was a systematic process, as you allege?
MR. DIORIO: Objection.



A: Two years of being involved with other sales managers at Quebecor for other divisions.
Q: Do you know over the past two, the years, the two years prior to late summer of 2002 it was your understanding that Quebecor had a systematic process of terminating older —
A: That's how I felt.
Q: That's how you felt?
MR. DIORIO: Objection.
A: Yes.
Q: Do you have any written documentation of that?
A: No.
MR. DIORIO: Objection.
Q: And were you told by Quebecor's management there was a process going on?
MR. DIORIO: Objection.
A: No.
Q: It was just a sense you had?
A: Yes.
MR. DIORIO: Objection.
Q: And what was that sense based upon?
MR. DIORIO: Objection.
A: The way I was being treated.
Q: Was it also the way other people were being treated?



MR. DIORIO: Objection.
A: No.
Q: Well, now, you've said it was a systematic process of terminating, of either terminating older sales representatives, encouraging their resignation, their early retirement, or increased productivity and sales quotas and demands for older employees. That indicates action taken as to more than just yourself, doesn't it?
MR. DIORIO: Objection.
A: It indicates that, yes.
Q: And was it your observation during the two years prior to the late summer of 2002 that the defendants were systematically targeting older sales representatives for termination, resignation, early retirement, or increased productivity and sales quotas?
MR. DIORIO: Objection.
A: No.
Q: Well, why is it that you say in paragraph 14 in your Amended Complaint there was a systematic process?
MR. DIORIO: Objection.
A: I didn't feel it was for the salespeople at Quebecor World Packaging Graphics. It was for



other Quebecor World employees at different divisions that I was in contact with, like peers, other sales managers.
Q: Well, but your complaint doesn't say sales managers, does it?
A: No.
MR. DIORIO: Objection.
Q: It says sales representatives.
A: Correct.
MR. DIORIO: Objection.
Q: Who are the older sales representatives who were terminated that you are referencing in paragraph 14?
MR. DIORIO: Objection.
A: They were other sales managers at other divisions that were either let go or resigned.
Q: But your complaint doesn't say sales managers, does it?
A: No, it does not.
MR. DIORIO: Objection.
Q: And my question was who were the older sales representatives who were terminated?
MR. DIORIO: Objection.
A: At Packaging Graphics, Ken Porter was the only other one.